**REGENCY OLDSMOBILE, INC., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, et al., Defendants.**

**Civ. A. No. 87–314.**

United States District Court, D. New Jersey.

Aug. 28, 1989.

Mark C. Perlberg and Margolis Chase,
Verona, N.J., and William J. Thomashower

and Mark Landau, Kaplan, Thomashower & Landau, New York City, for plaintiff.

Michael S. Waters and Scott J. Sheldon, Carpenter, Bennett & Morrissey, Newark, N.J., and Judith L. Collier, General Motors Corp., Detroit, Mich., for defendant General Motors Corp.

## OPINION

WOLIN, District Judge.

Defendant General Motors Corporation ("GM") moves for partial summary judgment dismissing the claims of plaintiff Regency Oldsmobile, Inc. ("Regency"), a franchised GM automobile dealer. Regency's claims arise out of its nationwide sale of an extended manufacturers warranty called the General Motors Protection Plan ("GMPP" or the "Plan"). Regency alleges that GM breached its obligations to Regency under federal and state franchisee protection statutes and under the common law. Regency further alleges that GM violated the federal and state antitrust laws by conspiring with other GM dealers to eliminate Regency as a nationwide seller of the GMPP and by attempting to corner the national GMPP market for itself. GM's actions, according to Regency, caused Regency great financial loss and ultimately led to the destruction of the dealership.

After a careful review of the record, the Court has found insufficient evidence to support Regency's claims that GM violated the antitrust laws and will therefore grant GM summary judgment on the antitrust claims. On the other hand, because of factual issues that are unresolvable from the current record, the Court cannot determine as a matter of law whether GM breached its statutory and common law duties to Regency as a franchisee, and will therefore deny GM's request for summary judgment on the remaining claims, with one minor exception.

## FACTS AND ALLEGATIONS

Regency operated as an authorized Oldsmobile dealer from January 1981 through April 1989, when the assets of the dealership were sold off. During this time, Regency was authorized to sell and service Oldsmobile vehicles under a Dealer Sales and Service Agreement signed with GM. Regency was also authorized to sell the General Motors Protection Plan, an extended manufacturer's warranty, which entitled GM new vehicle owners to receive free parts and labor on certain repairs, subject to the time and mileage limits of various plans. The GMPP was sold only by GM automobile dealers, and only to GM new vehicle owners.

General Motors sent its Administrative Guide for the GMPP to all its automobile dealers in advance of each new model year. In its Administration Guide for model year 1985, issued in late 1984, GM encouraged its dealers to actively promote the sale of the GMPP. In a section entitled "Overview," the Guide states:

> The GM Protection Plan can prove to be an important profit maker for your dealership, at little or no risk. The GM suggested selling price (mandatory in Florida) for the Plan allows for a substantial profit margin over dealer cost. In addition, a quarterly penetration bonus program provides the opportunity for additional profit on each Plan sold when a dealer actively Promotes Plan sales.

Administration Guide, West Affidavit of February 24, 1987 [hereinafter First West Affidavit] Exhibit D, at 1.

Under the guidelines established in the GMPP manual, all GM new vehicle owners were entitled to purchase the plan at the time of vehicle purchase or at any time "up to the day the vehicle has been in service for 12 months or accrued 12,000 miles on the vehicle odometer." Id. at 3. Under "unique circumstances," the GMPP coordinator at the dealer's division zone office could approve sales to customers with vehicles in service for more than 12 months or 12,000 miles. Id. The Administration Guide did not prevent GM dealers from selling the service contract to customers who purchased a new GM vehicle at other dealerships. Although not prominently displayed, a paragraph in the Guide offers the following sales suggestion from a GM dealer: "[T]here are two other GM dealers in

this town who sell brand X. So I put the GM Protection Plan logo in the paper with my new car ads and write headquarters underneath. I sell Plans to a lot of their customers." *Id.* at 54.

The 1985 Guide introduced a new method of financing the Plan: the GM Protection Card. This charge card program, administered by the National Bank of Delaware (NBD), enabled qualified customers to finance the retail selling price of the plan. Customers were also permitted to pay for the plan in cash, finance it along with the new vehicle or use a major credit card. GM would charge the dealer for GM's share of the purchase price by directly billing the dealer's open account. *Id.* at 5.

Customers were allowed to cancel the Plan within 60 days of purchase and receive a full refund of the purchase price. Customers who cancelled the Plan after 60 days were entitled to a prorated refund "based on the lesser of the time or mileage remaining of Plan coverage." *Id.* at 19. When a customer cancelled the GMPP, GM "charged back" the dealer's open account for the dealer's share of the refund.

The bonus program mentioned above provided an incentive for dealers to aggressively market and sell the GMPP. A dealer who sold large numbers of Plans was provided with quarterly cash rebates calculated as a percentage of a dealer's market penetration. For example, if a dealer sold 50 GMPPs out of 100 vehicles sold in a line, it would receive a $70 bonus for each plan sold. *See id.* at 17. Initially, bonuses were paid on all Plans sold by a dealer, including sales to customers who purchased their vehicles at their dealerships. Thus, a dealer could sell Plans to large numbers of GM new vehicle owners, achieve a market penetration far in excess of 100%, and receive bonus payments on all Plans sold. Moreover, if customers cancelled their Plans, dealers would still keep their bonuses. *Id.* at 19.

In addition to providing GM and its dealers with substantial profits in the short term, the GMPP was designed to promote customer satisfaction and develop long-term customer loyalty to GM products and services. As stated in the 1985 Guide,

> [t]he primary purpose of the GM Protection Plan is improved customer satisfaction with the GM vehicle ownership experience. The goal of the Plan is to retain the nameplate loyalty of the owner, who, it is hoped, will return to you in the future to buy new GM vehicles.... The GM Plan is designed to provide you and your customers with a GM product, identifiable with GM and the vehicle division trademark you represent....

*Id.* at 1.

In the fall of 1984, Regency developed a program to sell the GMPP nationwide to GM new vehicle purchasers through direct mail and telemarketing. After a successful test of its idea in January 1985, Regency undertook a full-scale marketing effort.[1] Opposition Brief, at 11–12. By mid-October of 1985, Regency had sold over 17,000 GMPPs. *Id.* at 16. Although Regency's success produced profits for both the dealership and GM, the two parties became embroiled in a dispute over Regency's nationwide marketing efforts.

GM alleges that Regency's telemarketing and direct mail solicitation were purposefully designed (1) to create the false impression that General Motors, and not Regency, was offering the GMPP for sale, and (2) to induce prospective buyers into calling Regency's toll-free number by falsely implying that a warranty or recall problem existed. GM asserts that Regency accomplished its objective, in large measure, through use of a postcard that listed "General Motors Protection Plan Headquarters, P.O. Box C, Lakewood, NJ 08701" as its return address and that included the following message: "URGENT! Please call at your earliest convenience. Toll Free 1–800–446–7526. Please have your General Motors Manufacturers Warranty Book in hand." Initial Brief, at 5–6. GM claims that by mid-March of 1985 it had received hundreds of complaints from angry customers who believed that they had received

---

1. Over the course of the next year-and-a-half, about 20 GM dealers began similar efforts to market the GMPP nationwide. *See* Perlberg Affidavit Exhibit B, at P–190.

a recall notice from General Motors. *Id.* at 8. In response to these complaints, GM asserts, it asked Regency to modify its solicitation materials. GM claims that, at all times, it acted independently to protect its trademarks and good will and to ensure honest salesmanship. *Id.* at 29–30.

Regency alleges that its solicitation materials were encouraged by the GM Administration Guide and were expressly approved by GM officials. Opposition Brief, at 12–13. Regency also asserts that it modified its solicitation materials in response to GM's "demands" and that it did so to avoid termination of its right to sell the GMPP. According to Regency, "the successive modifications eventually rendered the [sales] techniques ineffective." Opposition Brief, at 15–16. Regency claims that GM forced Regency to modify its sales tactics as part of an overall conspiracy with other dealers to "force Regency out of its nationwide sales program and to impose unreasonable territorial restrictions." *Id.* at 15. GM allegedly did this in order to take over the nationwide GMPP sales market and to appease threatening dealers who were angry that Regency was selling the GMPP at discount prices in their areas. *Id.* at 2, 26.

On August 30, 1985, GM wrote to Regency informing the dealership that its rights to sell the GMPP would be terminated as of October 1, 1985. The letter cited GM's continuing concerns over consumer deception and infringement of trademark rights. Amended Complaint Exhibit K. However, on October 16, 1985, the parties entered into a Supplemental Agreement governing Regency's sale of the GMPP. The parties stipulated that "[t]he terms and provisions of this Agreement are intended to avoid consumer confusion, mistake, and deception." Supplemental Agreement ¶ 7, Amended Complaint Exhibit L. Under the terms of the agreement, Regency agreed to clearly identify itself as Regency Oldsmobile, Inc. on all communications concerning the GMPP and to refrain from identifying itself as "Headquarters" for the GMPP on all solicitation materials and over the telephone. *Id.* ¶¶ 2.1, 2.6. Regency also agreed to

refrain from stating or implying in any and all written and oral representations and communications ... that Regency's solicitation of GMPP purchases originate from GM or from the GMPP, or that Regency is affiliated with GM or the GMPP in any capacity other than as an independent Oldsmobile dealer and an authorized seller of the GMPP, or that Regency has any exclusive rights or privileges with respect to the GMPP.

*Id.* ¶ 2.9.

On the same day the Supplemental Agreement was executed, GM and Regency signed a General Motors Continuous Protection Plan Participation Agreement (Participation Agreement). The Participation Agreement authorized Regency to sell the GMPP and spelled out the general obligations of each party.

GM alleges that Regency violated the terms of the Supplemental Agreement in November 1985 by sending out a solicitation letter that falsely stated that Regency was authorized to sell the mechanical protection plan "at a SPECIAL LOW PRICE." Initial Brief, at 13. On December 30, 1985, GM wrote to Regency informing the dealership that it was in violation of the Supplemental Agreement, again threatening to terminate Regency's authorization to sell the Plan. In a letter response, dated December 30, 1985, Regency stated:

we are constrained to believe that the true purpose of your concern is the substantial price break offered in the Final Opportunity solicitation. Perhaps this concern is based on the complaints made to GM by other dealers.

Amended Complaint Exhibit N.

On January 6, 1986, Regency wrote to GM indicating that it would modify its solicitation letter in accordance with GM's request. Amended Complaint Exhibit O. Moreover, on May 12, 1986, Regency met with GM to stress, among other things, that it was unable to effectively market the GMPP using the current postcard. Initial Brief, at 13. In a letter dated May 16, 1986, Regency repeated its concerns and enclosed for GM's review three postcards

"that, in our opinion, *would* effectively market the GMPP without causing confusion to consumers." Amended Complaint Exhibit R (emphasis in original). Attached were three postcards, each containing one of the following phrases in large, bold capital letters: "URGENT!"; "URGENT NOTICE!"; and "RESPONSE REQUIRED." GM responded in a letter dated June 13, 1986 that the postcards were unacceptable, adding that "they could alarm and mislead consumers and cause the same type of serious customer relation problems encountered with Regency's earlier postcards." Amended Complaint Exhibit 5. That same month, Regency discontinued its nationwide sales of the GMPP.

As noted above, Regency claims that GM acted not to protect its trademarks and customer goodwill, but to push Regency out of the nationwide GMPP sales market; GM acted in concert with local dealers to eliminate Regency as a national seller because it was selling the Plan "at a steep discount in competition with local dealers." Opposition Brief, at 17. To support its conspiracy claim, Regency points to three specific instances of alleged concerted activity between GM and certain dealers designed to thwart Regency's nationwide GMPP sales. The three agreements, which plaintiff calls "The Oldsmobile National Dealer Council Conspiracy," "The Tarrytown Zone Conspiracy," and "The Memphis Zone Agreement," are summarized in the paragraphs that follow.

(1) *The Alleged Oldsmobile National Dealer Council Conspiracy*

The National Dealer Council is a "Board of Review" comprised of elected representatives of local Oldsmobile dealers. Opposition Brief, at 19. A division of the Council met in Atlanta in late 1985 to discuss nationwide sales of the GMPP, among other topics. Deposition of C.N. Moore, Perlberg Affidavit Exhibit M, at 47. According to an Oldsmobile official present at the meeting, there was no formal discussion of nationwide GMPP sales. Following the meeting, however, the dealers presented GM and Oldsmobile officials with a list of questions and recommendations. The dealers

"[r]ecommend[ed] [that] Oldsmobile make every effort to stop the interstate solicitation of GMPP policies that are made to look like they are legitimate requests from Oldsmobile or the dealer the car was purchased from." The dealers also recommended that "bonus participation be based on sales of cars delivered by that dealership." Perlberg Affidavit Exhibit B, at P–140.

GM stated, in a written response, that while it "has no objection to the concept of dealer follow-up programs to sell the Plan, GM does not endorse such programs...." *Id.* Regency alleges that the dealer council "was plainly successful in obtaining GM's agreement to the demanded restrictions." Opposition Brief, at 19. Regency asserts that, in response to the "demanded restrictions," GM announced that it "does not encourage GMPP telemarketing or direct mail programs to *other* than a dealer's own customers." Opposition Brief, at 20 (emphasis in original). GM also announced that, effective October 1, 1986, bonuses would be paid only on plans "sold by the same dealer that delivers the vehicle," and that the number of plans eligible for bonus payments would be limited to 200 percent of a dealer's retail vehicle sales in a quarter. *Id.*

(2) *The Alleged Tarrytown Zone Conspiracy*

An Oldsmobile official, Jim Coleman, called a GM official, Bernie McGuire, to inform him that he had been contacted by Atlantic Oldsmobile concerning Regency's sales of the GMPP. The dealer told Coleman that if Regency contacted his customers and asked them to cancel their current GMPP and purchase a discounted Plan from Regency, then "he was going to discontinue selling the product at his Oldsmobile store as well as several other GM stores that he had an interest in." Deposition of Bernie McGuire, Perlberg Affidavit Exhibit D, at 103. Regency alleges that, in response to this "threatened boycott," GM conspired with R.L. Polk Co., an independent firm, which generated lists of GM new car owners, to provide Regency and other dealers with purged lists that did not include the names of persons who had previ-

ously purchased Plans from their local dealers. To support its conspiracy claim, Regency also cites the testimony of a Polk official, John B. Watkins, who stated that other dealers were upset about the nationwide marketing of the GMPP and wanted Regency and other sellers to be "shut down and stopped." Deposition of John B. Watkins, Perlberg Affidavit Exhibit V, at 98–99; Opposition Brief, at 23.

### (3) The Alleged Memphis Zone Agreement

Regency's President, David West, testified that in September 1985, Oldsmobile's District Manager, Jim Reid,

> told me that dealers in the Memphis Zone had been complaining about my GMPP sales in their area at discounted prices. Reid told me that his boss, Larry Tierney, told him to handle it. Reid told me to stop selling there until it cooled down a bit. When I refused, Reid told me if I wanted to get new Oldsmobiles as I had in the past, I should stop soliciting there. I told Reid that I would.

West Affidavit of April 10, 1989 [hereinafter Second West Affidavit] ¶ 24. In a follow-up memo to Larry Tierney, Reid stated: "I've discussed the problems the Memphis Zone has had through Regency's mailings with Dave West. He now has discontinued the mailings to that part of the country. Hopefully, we won't have any more complaints from the Memphis area." Perlberg Affidavit Exhibit B, at P–106. Regency also cited a memo from the Memphis Assistant Zone Manager, C.C. Barnett, III, to an Oldsmobile official, Bernie McGuire, concerning complaints by Memphis dealers about Regency's GMPP solicitations. Barnett states: "I have explained to these dealers that Oldsmobile, GMPP, and the Corporation have tried to stop this activity, yet, have no legal right to do so according to the courts." Perlberg Affidavit Exhibit B, at 25; see Opposition Brief, at 25.

In addition to the three conspiracies discussed above, Regency alleges that GM made numerous changes in the administration of the GMPP, all of which were designed to cripple the efforts of Regency and other dealers to market the Plan nationwide. These changes include the following:

(1) GM's assertion, contrary to the GMPP Administration Guide, that no Plan sales were allowed to customers with vehicles in service for more than 12 months or 12,000 miles. Opposition Brief, at 14.

(2) GM's own entry into the GMPP nationwide sales market in July 1985, and its refusal to provide dealers with the same customer lists it was using to solicit sales. Opposition Brief, at 26–27.

(3) GM's assertion in its revised 1986 Guide that the GMPP "is not intended to be a stand-alone business." Perlberg Affidavit Exhibit B, at 185.

(4) GM's modifications to the GMPP bonus program, which included imposition of the 200 percent cap discussed above and provision of bonus dollars only when the dealer sold both the Plan and the new car. Opposition Brief, at 29.

(5) GM's failure to register Regency as a seller of the GMPP in Florida. Under Florida law, GM was required to register all of its dealers proposing to sell the Plan in that State. Regency alleges that GM did not file the application for "many months." Opposition Brief, at 33. Second West Affidavit ¶ 20.

(6) GM's rejection of Regency sales to GM employees when Regency sold the Plan "below cost." Regency actually made a profit on such sales because of subsequent bonus payments to its open account. Opposition Brief, at 34. Second West Affidavit ¶ 20; id. Exhibit I.

(7) GM's modification of its cancellation and chargeback policy governing the GMPP. These changes included (a) calculation of refunds based solely on time remaining on the Plan, rather than the lesser of time or mileage remaining, Opposition Brief, at 36, (b) GM's allowing customers who purchased their GMPP from Regency to first cancel their plans more than 60 days after the date of purchase, id. at 37; (c) GM's charging back dealers for bonuses paid on flat cancellations, id. at 37–38; and (d) GM's acceptance of "fraudulent cancel-

lations," including instances where dates were tampered with or plans were cancelled when customers had more than 12,-000 miles or 12 months on the car, even though such sales were made with zone approval, *id.* at 38–39.

Regency claims that the general changes to the cancellation and chargeback procedures had a more damaging effect on Regency and other nationwide sellers of the GMPP than on local dealers. Dealers who sold the Plan along with the vehicle were less likely to experience cancellations because GMPP payments were included in monthly car payments. Opposition Brief, at 36. Thus, the modifications, though not facially discriminatory, allegedly had a disparate impact on national sellers.

Regency also alleges that GM made the "improper charges" against Regency's open account without giving the dealers an opportunity to dispute the charges; eventually, the chargebacks cut into Regency's non-GMPP earnings and destroyed the dealership. Opposition Brief, at 39–40. Seen as part of an overall conspiracy to eliminate Regency as a nationwide GMPP seller, GM's use of the Plan cancellation charges was allegedly for the purpose of delivering its final blow to the dealership.

## DISCUSSION

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." As the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." In making this determination, a court must make all reasonable inferences in favor of the non-movant. Once this is done, summary judgment will be granted if no reasonable trier of fact could find for the nonmoving party. *Id.*

In its motion GM has focused principally on the federal antitrust claims asserted by Regency in counts 10 through 13 of the Amended Complaint. Thus the Court will consider those claims first.

## I. Federal Antitrust Claims

The Third Circuit has repeatedly stated that summary judgment in antitrust cases is disfavored. *Arnold Pontiac–GMC, Inc. v. General Motors Corp.,* 786 F.2d 564, 572 (3d Cir.1986). The Supreme Court has held, however, and the Circuit has acknowledged, that summary judgment is proper where there is no significant evidence to support an antitrust claim. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Arnold Pontiac,* 786 F.2d at 572. Regency has asserted claims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. The Court will address the claims under each section in turn.

### (A) *Sherman Act § 1 Claims*

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. In *Tunis Brothers Co. v. Ford Motor Co.,* 763 F.2d 1482, 1489 (3d Cir.1985), the court noted four conditions that must be satisfied to establish a § 1 violation:

(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Id.* at 1489. Because the Court finds that the plaintiff has not provided a sufficient quantum of proof necessary to establish an inference of conspiracy, it will not be necessary to determine whether the second, third and fourth conditions have been met.[2]

---

**2.** It is worth noting that even if the plaintiff had provided sufficient evidence of a conspiracy, it

The leading case interpreting § 1 of the Sherman Act is *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), where a terminated distributor of agricultural products alleged a conspiracy between the manufacturer and other distributors to fix resale prices and terminate the plaintiff. In *Monsanto*, the Court stated that "[i]ndependent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.* at 761, 104 S.Ct. at 1469. The Court also stressed that dealer complaints about price cutters was part of the natural process of interaction between a manufacturer and its distributors:

> Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct. As Monsanto points out, complaints about price cutters 'are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals.'

*Id.* at 763, 104 S.Ct. at 1470. The Court in *Monsanto* set forth the following test for determining whether a § 1 claim will withstand a summary judgment motion:

> There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently.... [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'

*Id.* at 764, 104 S.Ct. at 1471 (citation to quotation omitted).

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court explained the *Monsanto* rule as follows:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in [*Monsanto*] we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.

*Id.* 475 U.S. at 588, 106 S.Ct. at 1356.

Before applying the *Monsanto/Matsushita* rule to the case at bar, it is worth stressing two points. First, in evaluating the sufficiency of plaintiff's conspiracy claim, the Court must strive to see the constellation from the stars.

> [P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. ' * * * [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'

*Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (citation to quotation omitted). Second, in determining whether a regulation or act is proscribed by § 1, the Court must consider the purpose or intent behind the regulation or act. As Justice Brandeis stated in *Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918),

> [t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.... The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help

---

is unlikely that the second condition has been met. Because of GM's low percentage of market share of sales of the GMPP, discussed in Part I(B), *infra*, it is unlikely that an agreement to

restrict sales in the Memphis Zone would have "adverse, anti-competitive" effects within the relevant market.

the court to interpret facts and to predict consequences.

To support its claim of a Sherman Act conspiracy, plaintiff relies heavily on a case involving the same defendant, *Arnold Pontiac, supra.* In *Arnold Pontiac*, a group of Buick dealers from the Pittsburgh area met with a GM official and threatened not to cooperate in future GM programs or activities, and to file a lawsuit, if GM placed an additional Buick dealership in the area. GM subsequently decided not to award a franchise to the plaintiff. *Id.* at 573. The Third Circuit, reversing the district court's grant of summary judgment for defendant, held that GM had changed its position on awarding the dealership in response to the dealer threats:

> Reviewing this evidence and drawing the inferences from the underlying facts in the light most favorable to Arnold Pontiac as the party opposing the summary judgment motion ... we must infer that the Better Buy Buick Association's conduct contributed to GMC's decision not to award Arnold the Buick franchise. GMC's position concerning the award of a Buick franchise changed, it seems, only after it learned of the Association's April 3, 1980 meeting, where the Pittsburgh Buick dealers indicated their disapproval of the placement of an additional Buick franchise in the ... market....

*Id.* at 573–74 (citation omitted).

Regency alleges that "almost identical circumstances" exist in the case at bar: GM initially approved Regency's solicitation materials, encouraged the dealer to aggressively market the GMPP, but then changed its position after receiving dealer complaints about competition. Opposition Brief, at 58. Specifically, Regency asserts that "GM's initially positive outlook toward Regency's high volume sales changed at or *after* the Oldsmobile National Dealer Council meeting and the discussion with dealers in the Tarrytown Zone." *Id.* at 62 (emphasis in original).

Regency's assertion that GM initially approved of its solicitation materials and encouraged the dealer to aggressively market the Plan is supported by the evidence. As noted above, the GMPP Administration Guide for model year 1985 informed dealers that the Plan "can prove to be an important profit maker for your dealership." Administration Guide, at 1. The Guide also included a suggestion that dealers sell Plans to customers of other GM dealers while using the word "headquarters" in their sales materials.

GM officials also approved of Regency's solicitation materials and encouraged increased sales of the GMPP in the early stages of the marketing campaign. Al Thomas, Manager of the GMPP, indicated in a February 13, 1985 letter to David Gartenberg, Manager of Regency Oldsmobile, that GM would not object to Regency's use of the "URGENT" postcard "if after the word 'Headquarters' you inserted the identification of the dealership, Regency Oldsmobile, Inc." Perlberg Affidavit Exhibit B, at 115. GM's District Manager for the Philadelphia zone, Jim Reid, wrote "Super Job Keep Rolling!" in the margin of a March 12, 1985 letter to Regency that listed Plan sales for the month of January. *Id.* at 87.

Regency's next claim, that GM changed its position on Regency's marketing efforts as a result of the Oldsmobile council meeting and Tarrytown zone discussions, is less persuasive. Both incidents took place well after the parties signed the Supplemental Agreement in mid-October of 1985. Regency estimates that the Oldsmobile National Dealer Council meeting took place in December 1985 or January 1986. Opposition Brief, at 19. The alleged "Tarrytown Zone Conspiracy" took place in April 1986, two months before Regency discontinued its nationwide GMPP sales campaign. Thus the alleged conspiracies took place 8 and 14 months, respectively, after Regency began its full-scale operations, and long after GM first objected to Regency's solicitation materials. The chronology of events in *Arnold Pontiac, supra,* is more conducive to a conspiracy scenario. There, GM made representations to the plaintiff that it was under consideration for a Buick dealership. The local dealers association then met with a GM official to voice its objections. GM

subsequently decided not to award the dealership to the plaintiff. 786 F.2d at 573–74.

Looking at the substance of the allegations concerning the Oldsmobile council meeting and Tarrytown Zone discussions, there is little to suggest that the *Monsanto/Matsushita* threshold has been reached. As noted above, an Oldsmobile official present at the dealer council meeting stated that no formal discussion of nationwide GMPP sales took place there. Deposition of C.N. Moore, Perlberg Affidavit Exhibit M, at 49. Following the meeting, the dealers *recommended*, in writing, that GM "make every effort" to stop nationwide GMPP sales that were made to look like solicitations from Oldsmobile or the original dealer that sold the car. There is no evidence of any explicit demands or threats.

Nor is there evidence of any improper reaction by GM to any threats, such as they were. In its written response, GM stated that while it "has no objection to the concept of Dealer follow-up programs [i.e., nationwide campaigns] to sell the plan, GM does not endorse such programs." Perlberg Affidavit Exhibit B, at 140. This is a neutral statement that, on its face, does not lead to an inference of conspiracy between GM and its dealers. GM also went on to state its concern over objectionable sales tactics:

> For dealers deciding to pursue a GMPP follow-up sales program, GM insists that extreme care be taken to avoid the potential misuse of GM trademarks, as well as misrepresentation of the Plan as other than a service contract, or the dealer as other than an authorized vehicle division new car or truck Dealer who is also authorized to sell the GM Protection Plan like all participating GM dealers.

*Id.*

The Oldsmobile dealers council also recommended that bonus payments "be based on sales of cars delivered by that dealership." *Id.* GM stated, in response, that "should Oldsmobile find it necessary to review the existing Bonus format, Council's comment will be given every considera-

tion." *Id.* Regency asserts that GM responded to the "demanded restrictions" by announcing the 200 percent cap on bonus payments. This change, however, did not become effective until October 1, 1986, four months after Regency stopped selling the GMPP nationwide.

The alleged Tarrytown Zone Conspiracy involved a complaint by an Oldsmobile dealer to GM's District Manager for the Tarrytown Zone, Jim Coleman, concerning Regency's GMPP sales. The dealer, John Staluppi, who was owner or part owner of 22 dealerships, complained that Regency was contacting new car owners and asking them to cancel their GMPPs and purchase a discounted plan from Regency. Reply Brief, at 10; *see also* Sheldon Affidavit Exhibit G. Bernie McGuire, an Oldsmobile official, testified that the dealer told Coleman that he would discontinue selling the Plan if the practice was not stopped. Deposition of Bernie McGuire, Perlberg Affidavit Exhibit D, at 103. GM states that Staluppi told GM that he had lost $47,000 as a result of Regency's sales and that he would no longer sell the GMPP. Reply Brief, at 10; *see also* Sheldon Affidavit Exhibit G.

Regency claims that GM thereafter conspired with R.L. Polk Co., which provided new car owner lists to Regency and other dealers, to generate lists that would be purged of the names of owners who had previously purchased the GMPP. GM concedes that it took action to prevent dealers from inducing owners to cancel their policies and repurchase the Plan. GM calls this sales tactic a "dirty trick" and asserts that it acted independently to protect consumers. Reply Brief, at 11.

GM worked with R.L. Polk Co. "to incorporate a program" that would generate purged lists. Deposition of Bernie McGuire, Perlberg Affidavit Exhibit D, at 105. On April 9, 1986, GM issued a letter to be distributed to dealers announcing that customers would not be permitted to cancel their GMPP and repurchase a Plan from another dealer. In a cover letter to GM officials, Al Thomas stated that "such a practice causes tremendous upward pressure on GMPP administrative costs and in

many cases has left an otherwise satisfied owner without coverage when a failure occurs." Sheldon Affidavit Exhibit G.

This Court agrees with GM's argument that its actions to prevent cancellation and repurchasing of the GMPP did not amount to a conspiracy to damage Regency. GM's assertion that John Staluppi was not concerned about Regency "undercutting his prices or selling to 'his' customers," Reply Brief, at 11, is questionable. It is reasonable to assume that Staluppi, like any dealer, would be concerned about his loss of business resulting from the cancellation. But as *Monsanto, supra,* points out, dealer complaints about price cutters do not, alone, create an inference of conspiracy. 465 U.S. at 763, 104 S.Ct. at 1470. The relevant question here is whether GM acted independently. It appears that GM acted to protect owners who faced possible lapses in their policy coverage and to prevent unnecessary administrative expense resulting from customers cancelling and repurchasing the Plan. GM may have also been acting to protect its image among its customers: at least some owners who were urged to cancel and repurchase their plans were likely to have viewed Regency's solicitation as an over-aggressive or offensive marketing tactic. Even if GM was acting unreasonably or capriciously, however, such actions do not an antitrust claim make.[3] Certainly, Regency has not presented sufficient evidence on this point that would "tend to exclude the possibility" that GM acted independently.

The Court, then, must reject plaintiff's assertion that GM changed its outlook on Regency's sales efforts as a consequence of the Oldsmobile dealer council meeting and the Tarrytown Zone incident. In the first case, GM took no action in response to the dealer recommendations. In the second case, GM appears to have acted independently.

Regency's allegations concerning the Memphis Zone conspiracy similarly do not raise a triable issue of fact as to whether GM violated § 1 of the Sherman Act. As recounted by Regency's President, David West, Oldsmobile's District Manager, Jim Reid, threatened to cut off Regency's supply of Oldsmobiles if the dealership did not discontinue its GMPP sales in the Memphis Zone. Second West Affidavit ¶ 24. According to West, Reid called him in September 1985 and "told me that dealers in the Memphis Zone had been complaining about my GMPP sales in their area at discounted prices." *Id.* In a follow-up memo to his boss, Larry Tierney, Reid stated: "I've discussed the problems the Memphis Zone has had through Regency's mailings with Dave West. He has discontinued the mailings to that part of the country. Hopefully, we won't have any more complaints from the Memphis area." Perlberg Affidavit Exhibit B, at 106. And in November 1985 the Memphis Assistant Zone Manager, C.C. Barnett, III, wrote to an Oldsmobile official, Bernie McGuire, about Regency's campaign and resulting complaints from Memphis dealers: "I have explained to these dealers that Oldsmobile, GMPP, and the Corporation has [sic] tried to stop this activity, yet, has no legal right to do so according to the courts." Perlberg Affidavit Exhibit B, at 25.

GM argues that a conspiracy cannot be inferred from these facts because (1) the "alleged Reid telephone call is ... suspect," (2) the Barnett memo related to dealer complaints about customer deception, not discounted sales, (3) following the alleged agreement, Regency continued to sell GMPPs in the Memphis Zone, (4) Regency is alleging an agreement between GM and Regency, not between GM and Memphis Zone dealers, to impose a territorial restriction on GMPP dealers.

For GM to suggest that the Reid telephone call is "suspect" is disingenuous. The follow-up memo from Reid to Tierney corroborates the fact that a phone call took place, and that it concerned Regency's GMPP sales in the Memphis Zone. It also

---

**3.** Unreasonable, capricious or bad faith actions may, in contrast, render GM liable under other legal theories. *See infra* Parts III–V.

implies that GM took action to mollify complaining dealers.

As for its second contention, however, GM is correct that the dealer complaint letter, Sheldon Affidavit Exhibit H, which is the subject of the Barnett Memo, discusses consumer deception and does not concern discount pricing. In addition, Barnett's response letter to the dealer suggests that the dealer take more aggressive steps to sell the GMPP. It also states that customer sales lists are purchased by other dealers from R.L. Polk and that "[i]t is illegal for Oldsmobile to sell any customer list." *Id.* Thus, it is possible to interpret the statement in Barnett's memo as a reference to the fact that Regency and other dealers cannot be legally prevented from purchasing customer lists from Polk. However, it appears that there were also more general concerns in the Memphis Zone about territorial encroachment by Regency. Larry Tierney, Jim Reid's boss, testified that the Memphis Zone manager, or an official from the Southeast Region, complained to him about Regency's "selling or attempting to sell to owners [of the GMPP] in his geographical area." In response to this complaint, Tierney then spoke to Reid: "I told Jim Reid, I had received a phone call from somebody in the Southeast Region or in the Memphis Zone, I can't recall, complaining about the aggressive posture that Regency had taken in that area, talk to Dave [West] and find out what's going on." Perlberg Affidavit Exhibit L, at 63–66. The alleged agreement not to sell in the Memphis Zone followed.

GM's third contention, that Regency continued selling the GMPP in the Memphis Zone after the alleged agreement, is supported by an affidavit and exhibit documenting all sales by Regency in Tennessee between September 1, 1985 and January 31, 1986. Hastings Affidavit Exhibit A. In a reply affidavit, Regency's David West contends that the 370 documented sales during this period were the result of (1) sales made prior to September 1 but not recorded by GM until after that date and (2) customer acceptances of Regency's earlier solicitations. West asserts that Regency made no further mailings into the Mem-

phis Zone after Jim Reid threatened Regency's supply of new Oldsmobiles. Exhibits attached to the West Reply Affidavit purport to show a decline in GMPP sales in Tennessee during this period as a percentage of overall national sales. West Reply Affidavit of July 5, 1989 [hereinafter Third West Affidavit] Exhibits A & B. The evidence presented by the parties is inconclusive. It is unclear whether the sales recorded for this period were a result of continued solicitations by Regency or mailing and other administrative delays. However, the Court need not decide this point because, as will be shown, plaintiff's allegations concerning the Memphis Zone do not establish that GM conspired with other dealers to restrict Regency's sales.

GM's final contention is that Regency's claim does not involve an agreement between GM and Memphis Zone dealers to restrict Regency's sales in the Memphis Zone. Under *Monsanto*, a Sherman Act § 1 conspiracy cannot "be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints." 465 U.S. at 763, 104 S.Ct. at 1470. GM cites several additional cases to support its contention that dealer complaints do not create an inference of concerted action, including *Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905, 909–10 (4th Cir. 1986), *cert. denied*, — U.S. —, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988). In *Garment District*, a terminated discount retailer brought an antitrust action against a sportswear manufacturer. The manufacturer terminated the plaintiff following threats by a major distributor to stop selling the defendant's clothing if the plaintiff was not terminated. The Fourth Circuit upheld the district court's grant of a directed verdict for the defendant, and stated:

*Monsanto* holds that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints. One reason is to avoid losing the business of disgruntled dealers. This reason grows in importance as the volume of dealer complaints increases. A manufacturer is not

prohibited from avoiding the potential loss of many of its dealers because it acted in response to price complaints. Therefore, regardless of whether the complaints are mere expressions of dismay or constitute economic duress, coercion, and threats, the terminated distributor must still present additional evidence that the manufacturer and another distributor acted in concert to set or maintain prices.

*Id.* at 909 (citing *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471).

In *National Marine Electronic Distributors v. Raytheon Co.*, 778 F.2d 190 (4th Cir.1985), the defendant similarly terminated the plaintiff-distributor after receiving threats and complaints from other distributors. The court held that the plaintiff had not presented evidence "that reasonably tends to prove that Raytheon [the defendant] and the complaining dealers schemed to terminate National [the plaintiff] for the purpose of restraining price competition." *Id.* at 192–93.

In its Opposition Brief, Regency alleges that GM conspired with its dealers to eliminate Regency as a "high volume discounter" of the GMPP. Opposition Brief, at 57. Regency, because of its high volume sales, and because of the quarterly bonuses provided by GM, could afford to offer the GMPP at discount prices and still turn a profit. Regency alleges that GM and its dealers were motivated by a desire to eliminate Regency so that they could sell the GMPP at retail price. In the alleged Memphis Zone conspiracy discussed above, however, Regency has not presented evidence of a conspiracy to set or maintain prices. At most, Regency has demonstrated that GM acted in response to dealer complaints, not in concert with Memphis dealers, to restrict Regency's sales in the Memphis Zone. Such unilateral action is not proscribed by *Monsanto*.

As for Regency's involvement in the alleged Memphis Zone conspiracy, the dealer asserts that it "unwillingly complied" with the conspiracy to bar its sales. Opposition Brief, at 56. The Supreme Court has held that an antitrust plaintiff may not be de-

nied recovery where his or her participation in an allegedly illegal scheme was involuntary. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Faced with a threat by an Oldsmobile official to cut off its supply of new vehicles, Regency's decision to discontinue sales in the Memphis Zone does not appear to constitute a voluntary agreement with GM. Thus, its participation should not bar its § 1 claim. However, Regency has not shown, to begin with, that it was forced to participate in an allegedly illegal scheme. The alleged Memphis Zone conspiracy can also be distinguished from the facts surrounding *Arnold Pontiac, supra*. In *Arnold Pontiac*, there was evidence of a preexisting horizontal agreement among Pittsburgh area dealers to prevent GM from awarding a Buick dealership to the plaintiff; the Third Circuit thus found it easy to infer that GM joined the conspiring dealers. Here, plaintiff has not presented evidence of a concerted agreement between Memphis dealers to prevent Regency from selling in the Memphis Zone. Without the advantage of evidence clearly demonstrating the existence of *some* conspiracy, Regency has a higher burden of production.

Regency asserts, of course, that the three specific conspiracies that it alleges were by no means isolated incidents but rather part of a larger scheme involving GM and other dealers to destroy Regency's nationwide sales campaign. For example, Regency alleges that GM's objections to Regency's sales techniques were actions in furtherance of the larger conspiracy. A review of the correspondence between the parties in the months preceding these incidents, however, reveals that GM consistently expressed similar concerns long before the incidents. In the period from February 1985 to the signing of the Supplemental Agreement in October 1985, GM, despite its initial enthusiasm, repeatedly demonstrated concerns about trademark abuse and consumer deception. In his February 13, 1985 letter to Regency's Dave Gartenberg, GM's Al Thomas requested

that Regency add the line "Regency Oldsmobile, Inc." to its postcard, noting that the "customer is being misled to believe the address given is a General Motors (GM Protection Plan) official headquarters." Perlberg Affidavit Exhibit B, at–115.

Following the February 13 letter, GM objected to Regency's use of the word "URGENT" on the solicitation postcards. The parties met on March 21, 1985 to discuss Regency's sales tactics. In its Opposition Brief, Regency states that it agreed to delete the word "URGENT" from the postcard and substitute the word "REMINDER." However, according to Regency, the parties agreed to allow the dealer to use the "URGENT" cards on a temporary basis until the "REMINDER" cards became available. Amended Complaint ¶ 40. It is unclear from the record whether such an agreement was explicitly made. In any event, Regency continued to mail the cards, and on April 1, 1985, Thomas sent a mailgram to Regency's David West, which read, in part, as follows:

> It has come to my attention that as recently as March 26, 1985, Regency Oldsmobile has continued to mail GM Protection Plan solicitation cards out containing the word "URGENT" with totally inadequate identification that the source of the card is Regency Oldsmobile and not General Motors. Furthermore, the personnel answering calls to the "800" phone number are still answering as General Motors rather than disclosing their affiliation with the dealership up front ... This is particularly distressing since we discussed these matters on March 21, 1985. *Such irresponsible marketing practices are serious concerns when they are conducted in conjunction with the use of the General Motors logo.* We insist that these practices be stopped immediately.

Amended Complaint Exhibit D (emphasis added).

In an April 2 response letter to Thomas, West stated that although the parties had agreed at the March 21 meeting to allow Regency to mail 60,000 "URGENT" cards before the new cards were printed, he would discontinue mailing them "as of todays [sic] date." Amended Complaint Exhibit E. However, the dispute over Regency's sales tactics continued. On April 10, Thomas repeated his objections to West over the phone. Thomas stressed that Regency's continued use of the words "URGENT" and "headquarters" on the solicitation cards was unacceptable. Thomas also objected to the fact that Regency's operators "were advising callers whose cars were beyond 12/12 that they could still purchase the Plan." Perlberg Affidavit Exhibit B, at 109.[4]

On May 23, the Philadelphia zone manager, Larry Tierney, wrote to West to reiterate GM's concerns: "We object to the implication in several of your documents that Regency Oldsmobile is a national headquarters for the GM Protection Plan ... For a national program such as yours, we think it is entirely inappropriate to use the 'headquarters' device." In closing, Tierney stated: "We raise these issues because you have made these mistakes in conjunction with your conspicuous use of a GM trademark." Amended Complaint Exhibit F. Regency interpreted GM's comment on its use of the word "headquarters" to mean that the designation could only be used on a local basis by dealers. *Id.* Exhibit H. GM denied that it was imposing "any territorial restrictions" on Regency, adding that "[o]ur quarrel, rather, relates to trademark abuse and the potential for consumer deception." *Id.* Exhibit I.

---

**4.** Regency argued that GM's position that sales of the GMPP were prohibited to customers with over 12,000 miles or 12 months on the car was (1) contrary to the Administration Guide and (2) designed to inhibit Regency's sales efforts. Although Regency alleges that sales beyond 12/12 were routinely approved prior to 1985, the 1985 Administration Guide provides that such sales could be approved by the dealer's zone office under "unique circumstances." *Id.* at 3. Statistics on how many Plan sales of the type were approved by GM in a given year are not provided in the record. However, GM's position does not appear to constitute a major change in the administration of the program. In addition, the change applied to sales of the GMPP by all dealerships, not just Regency.

On August 30, 1985, after months of negotiation, Oldsmobile's General Sales Manager, J.F. Mattox, informed Regency that its rights to sell the GMPP would be terminated as of October 1, 1985. The letter cited GM's concerns over trademark infringement and consumer confusion stemming from Regency's marketing efforts. Amended Complaint Exhibit K. As noted above, Regency's rights to sell the GMPP were not terminated and the parties signed a Supplemental Agreement on October 16, 1985. The now familiar refrain was incorporated into the agreement: "The terms and provisions of this Agreement are intended to avoid consumer confusion, mistake, and deception." *Id.* Exhibit L.

It is clear from the correspondence and negotiations between the parties that GM was concerned about possible trademark infringement and deception of the public. GM concedes that complaints were received from both dealers and customers during this time period. Initial Brief, at 16–18. Regency contends that GM has exaggerated the number of customer complaints concerning its sales activities. Opposition Brief, at 25–26. Whether there were hundreds of complaints or only scores is immaterial. The complaints were of sufficient quantity and of such a nature as to warrant concern on GM's part. Customers complained that Regency's postcard was misleading and threatened not to buy GM cars in the future. Thomas Affidavit Exhibit D. Some customers interpreted the "URGENT" postcard to mean that their warranties had expired or that their cars were being recalled. *Id.* Exhibit E.[5]

The correspondence between GM and Regency, viewed in the context of the customer complaints about Regency's sales tactics, suggests that GM acted only to protect its trademark and prevent customer deception. Regency asserts that GM was not motivated by such concerns, but rather that it acted in concert with other dealers to thwart Regency's nationwide sales campaign. In a case, such as this, where the defendant has "proffered substantial evidence supporting a plausible and legitimate explanation" for its conduct, the plaintiff may not "rest on conclusory assertions of [a] conspiracy." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*, 769 F.2d 919, 923 (2d Cir.1985).

In addition to the allegations discussed above, Regency claims that GM changed the rules governing sales of the GMPP in order to undermine and eventually destroy Regency's sales operation. A number of Regency's allegations do not support an inference of conspiracy or even a conclusion that GM acted unilaterally to restrict Regency's GMPP sales. For example, the imposition of the 200 percent cap on bonuses, discussed at great length by Regency in its Opposition Brief, did not take effect until October 1, 1986, four months after Regency stopped its nationwide GMPP sales. *See* First West Affidavit Exhibit F. Regency also asserts that GM's practice of giving dealers 50 percent of the profit on its own nationwide sales of the GMPP to GM customers constituted a "kick back ... clearly designed to discourage dealers from competing with GM nationally for plan sales." Opposition Brief at 65. It is hard to see how such a policy was designed to discourage competition. Dealers who sold the plan directly to their customers would

5. The following are excerpts from letters written to GM from angry customers who received Regency's postcard in the mail:

I did not appreciate receiving information in the mail depicting there is an emergency situation requiring my immediate attention, only to receive a 'sales pitch' from one of your dealers regarding a warranty plan I have already purchased.

[T]he notice looks 'very official' and can easily be mistaken for a recall notice. Concerned about my family's safety, I immediately contacted the phone number as directed in the

postcard, and found out very quickly that the campaign was nothing more than a sales pitch.

I am outraged that General Motors would send a card that I, perhaps naively, believed was in regard to a recall or some other important matter.

Believe me at this point I'm not decided whether to put this matter in the hands of my attorney for misrepresentation or just resolve to stop buying General Motors cars!!!
Thomas Affidavit Exhibit D.

continue to split their profits with GM; both GM and the dealers therefore profited from increased sales of the GMPP by dealers. Moreover, GM's policy did nothing to prevent Regency or other nationwide sellers from continuing their sales efforts.

Regency further claims that GM modified its cancellation and chargeback policy governing the GMPP in order to undermine and eventually destroy Regency's sales operation. GM responds that it was entitled to adjust the chargeback procedures used to calculate refunds on cancelled GMPP plans. GM asserts that such authorization was provided in the GMPP Administration Guide, and that Regency's David West acknowledged in his deposition that the GMPP sales procedures were subject to modification by GM. Initial Brief, at 56–57.

Specifically, GM contends that its decision to calculate refunds based on time remaining on the plan, without reference to mileage, was made to reduce administrative costs and eliminate delays in customer refunds. Its decision to allow customers to cancel the plan 60 days after receipt of plan materials, rather than within 60 days of ordering the materials, avoided unfairness to customers who received the materials more than 60 days after ordering them and would then be liable for pro rata payments to GM. Initial Brief, at 55–56. GM argues that these modifications promoted efficiency and customer satisfaction and that they were "applied ... uniformly to all of its GMPP distributors," and that Regency, in claiming that it was overcharged for its share of refunds, simply misunderstands how GM's calculations were made. Initial Brief, at 54; Reply Brief at 36. GM recommends that a technical master be appointed to resolve the issue of alleged errors and overcharges on the GMPP cancellations.

A review of the record on the question of whether GM modified its cancellation and chargeback policy in order to cripple Regency's sales campaign, or whether it applied these policy changes in a discriminatory manner for the same purpose, is inconclusive. For example, Regency's David West alleges that GM employees "appar-

ently fraudulently modified the customer's dates [on cancellation forms] in order to qualify the cancellation as a flat cancellation." Second West Affidavit ¶ 15. Attached as Exhibit G are GM cancellation forms purporting to show that dates were tampered with. Although there are some inconsistencies and discrepancies in the recorded dates, it is by no means clear that the forms were tampered with by GM employees.

The Court, however, need not decide this point, or the larger question of whether GM modified its procedures in order to damage Regency, as it pertains to plaintiff's Sherman Act § 1 claim. In order to withstand a motion for summary judgment, the plaintiff must present evidence that reasonably tends to prove that *the manufacturer and others* had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. Thus, an antitrust violation can only arise where the defendant has engaged in concerted activity. In the case at bar, plaintiff has not presented any evidence to show that GM carried out its policy on cancellation and chargebacks in concert with other parties.

Regency alleges that GM conspired with the National Bank of Delaware (NBD) to wrongfully cancel GMPP plans sold by Regency. Opposition Brief, at 116–17. NBD issued the GM Protection Card to customers who chose to finance their purchase of the GMPP; NBD also processed GMPP cancellations. Regency's expert antitrust counsel asserts that NBD may "have acted in conspiracy with GM to promote its position as the sole issuer of all GM's Protection Plan credit cards." Thomashower Affidavit ¶ 4(b). Pursuant to this claim, Regency has moved this Court for leave to depose an employee of NBD who was responsible for processing GMPP cancellations. The record, as developed thus far, suggests that NBD performed solely administrative functions for GM and did not conspire with GM to wrongfully cancel plans sold by Regency. Nor has plaintiff presented sufficient evidence to allow this Court to conclude that GM implemented its

cancellation and chargeback procedures as part of a larger conspiracy against Regency. Moreover, plaintiff's request for additional discovery was not made by formal notice of motion pursuant to the Federal Rules of Civil Procedure. If Regency wanted to preserve its rights under Fed.R. Civ.P. 56(f), it should have made a formal discovery request. Therefore, the Court will evaluate defendant's summary judgment on the present record. The record as it stands does not support Regency's allegation that GM utilized the cancellation and chargeback procedures in furtherance of a Sherman Act conspiracy.[6]

As noted earlier, plaintiff's allegations must be viewed as a whole, rather than compartmentalized. After analyzing plaintiff's claims in detailed fashion, a look at plaintiff's case in its entirety, however, does not yield any different conclusions. Plaintiff has simply not proffered sufficient evidence to allow the broad outlines of a conspiracy to emerge; whatever GM's motives were, it was acting unilaterally. Therefore the Court will grant summary judgment on the Sherman Act § 1 claims asserted in counts 10 through 13 of the Amended Complaint.

(B) *Sherman Act § 2 Claim*

In counts 10 through 13 Regency asserts that GM also violated § 2 of the Sherman Act, 15 U.S.C. § 2, which proscribes three separate offenses: (1) actual monopolization, (2) attempted monopolization and (3) combinations or conspiracies to monopolize. *See, e.g., Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 474 (3d Cir.1985). Plaintiff claims that defendant has violated § 2 in all three ways. The Court will consider the claims separately.

(1) *Actual Monopolization*

■ In *Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802, 808 (3d Cir.1984), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986), the Third Circuit explained the key components of a monopolization claim:

There are two main elements in monopolization: (1) the possession of monopoly power in a relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.

*Id.* (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)).

The first step in determining whether a § 2 violation has occurred is to define the "relevant market." The relevant market comprises a product or line of products in a geographic sales area. In *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), the Supreme Court defined the product market as those "commodities reasonably interchangeable by consumers for the same purposes." Regency contends that the GMPP comprises its own product market because no "reasonably interchangeable alternatives" are available to consumers. Opposition Brief, at 45. In support of its claim, Regency asserts that the GMPP is a "unique product unto itself because it applies only to GM cars and is a manufacturer's warranty, not insurance." Opposition Brief, at 46. According to Regency, a manufacturer's warranty is "necessarily unique to the underlying single product brand, and for that reason ... constitute[s] a separate market." *Id.* at 48. Plaintiff cites several cases in support of its contention, including *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1480–81 n. 3 (9th Cir. 1986), in which the court stated that an "owner of broken B & H micrographic equipment is indifferent to people who can service Kodak or 3M machines." Because the GMPP is a unique product, Regency argues, the determination of geographic market is not necessary because GM controls the market wherever it sells the GMPP. Opposition Brief at 49.

GM asserts that a single brand cannot be monopolized by a manufacturer unless it

---

**6.** The parties nonetheless remain in dispute as to whether GM, in the modification and execution of its chargeback procedures, violated its statutory or common law obligation to act in good faith. *See infra* Parts III–V.

represents a single product market. To support its contention, defendant cites *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir.1984), which held that "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market." In *Domed Stadium,* the court rejected plaintiff's argument that the relevant product market was Holiday Inn hotel rooms, rather than hotel rooms, as defined by the district court. *Id.* at 487–89.

GM argues that the GMPP does not constitute a single product because it competes with 57 additional extended protection plans offered through GM dealers and in the marketplace. Thomas Supplemental Affidavit ¶ 2. According to GM, "[t]hese competitive plans often are available in all fifty states, do not require the owner to advance repair costs, are willing to provide financing, and have other features similar to the GMPP." Reply Brief, at 24. In addition, GM dealers are under no obligation to sell the GMPP and are free to sell the non-GM extended protection plans to their customers. Thomas Supplemental Affidavit ¶ 2. In fact, in 1985 and 1986 only half of GM dealers sold the GMPP. *Id.*

GM contends that even if it took over nationwide sales of the GMPP, it would not possess monopoly power over the plan. If it raised prices to monopolistic levels, then thousands of local GM dealers would simply sell the GMPP to their new vehicle customers at lower prices. The 57 other competitors would also offer similar extended protection plans at lower prices. Initial Brief, at 36–37.

The Court finds defendant's arguments persuasive. When GM undertook its own nationwide GMPP sales campaign in mid–1985, it faced competition from 57 extended protection plan sellers and thousands of local GM dealers selling the GMPP. Regency's efforts to characterize the GMPP as a unique product are undermined by the fact that GM dealers were free to sell other plans to their customers and only half of GM's 10,000 dealers sold the GMPP in the 1985–86 period. Regency, itself, sold an

insurance plan called Auto Gard in mid–1986, although the dealer claims that its efforts were unsuccessful because the plan was "not 'reasonably interchangeable' with GMPP as a matter of fact or of consumer perception." Opposition Brief at 46. If the Court were to hold that the GMPP was a separate product market, as opposed to one of many extended protection plans, then an effort by GM to monopolize the nationwide sales market would still not constitute actual monopolization of the market. GM would still face competition from its local dealers for GMPP sales.

In *Domed Stadium* the court stated:

The offense of monopolization requires that the defendant dominate the relevant market.... The precise market share a defendant must control, absent supporting evidence of monopoly power before he is guilty of monopolization, remains undefined. In *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945), *approved and adopted, American Tobacco Co. v. United States,* 328 U.S. 781, 811–14, 66 S.Ct. 1125, 1139–41, 90 L.Ed. 1575 (1946), Judge Learned Hand created the widely accepted rule of thumb that while a 90 percent market share definitely is enough to constitute monopolization, 'it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not.' 148 F.2d at 424. Supreme Court cases, as well as cases from this court, suggest that absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization.

732 F.2d at 489.

Whether the relevant market be defined as extended protection plans, or as the GMPP, it is clear that GM does not possess the relevant market share to satisfy the requirements of an actual monopolization claim. The record therefore does not support plaintiff's monopolization claim.

### (2) *Attempt to Monopolize*

■ In *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir.1975), the Third Circuit articulated the two ele-

ments of an attempted monopolization offense: (1) "the actor [must] have a specific intent to monopolize the relevant market, and (2) the actor [must] have sufficient market power to come dangerously close to success." Thus, as with a claim of actual monopolization, market share is a critical consideration. The case law suggests that a market share of less than 50 percent may support an attempted monopolization claim "if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." *Domed Stadium,* 732 F.2d at 490.[7] However,

> [w]hile the exact market share percentage necessary to prove attempt to monopolize may vary under differing market conditions, absent a showing or special market conditions, a market share of less than 10 percent, as a matter of law, usually will not support a finding of attempt to monopolize.

*Id.* at 491 (citation omitted).

Under this lesser standard, it is clear that whether the relevant market be the GMPP, or extended protection plans generally, an attempt by GM to monopolize the market would not have a "dangerous probability" of success. For this reason, plaintiff's claim of attempt to monopolize is also unsupported by the record.

### (3) *Conspiracy to Monopolize*

■ One element of a conspiracy to monopolize offense is a "[s]pecific intent to monopolize the relevant market." *Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 153 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982).[8] In addition, "[s]uch intent may be inferred ... from the proof of actual monopoly power." *Id.* at 154.

In *American Tobacco Co. v. United States,* 328 U.S. 781, 788, 66 S.Ct. 1125,

1128, 90 L.Ed. 1575 (1946), the Supreme Court set forth an additional requirement: that conspiracy claims under §§ 1 and 2 of the Sherman Act must be "reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap."

As noted above, GM did not possess monopoly power over GMPP sales. Thus, Regency must prove its conspiracy to monopolize claim by presenting evidence that GM conspired with a specific intent to monopolize the relevant market. Regency's evidence to support this claim is identical to the evidence presented in support of its § 1 claim. The dealership contends that it

> has shown ample evidence of predatory or anticompetitive acts toward furtherance of a GM monopoly, by GM's escalating demands upon plaintiffs unilateral changes in the GMPP plan designed to disadvantage plaintiff rather than all dealers, cancellations in violation of GM's own written cancellation requirements and the wrongful chargeback of those cancellations against Regency's open account, necessarily designed to put plaintiff out of business as a dealer.

Opposition Brief, at 52–53.

Plaintiff's conspiracy to monopolize claim appears to be its § 1 claim in disguise. Moreover, plaintiff has not proffered adequate evidence to support an inference of a conspiracy to monopolize. As noted above, GM's "escalating demands" on Regency to alter its sales materials were motivated by a desire to protect its trademarks and prevent consumer deception. In addition, GM's modifications of its cancellation and chargeback procedures were implemented unilaterally and not in furtherance of a conspiracy, either in restraint of trade or to monopolize the relevant market.

---

7. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1300–01, 1309 (9th Cir.), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 974 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

8. *See also Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *American Tobacco Co. v. United States,* 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.,* 403 F.Supp. 643, 651 (E.D.Pa.1975), *aff'd without opinion,* 565 F.2d 154 (3d Cir.1977).

It should also be noted that plaintiff's § 2 claim is implausible from a conceptual standpoint. The GMPP was designed to increase customer satisfaction and promote loyalty to GM products. Customers who purchased the GMPP from their dealers and were satisfied with the Plan would be more likely to return to their dealers and buy a GM car in the future. It was therefore in GM's interest to encourage dealers to sell the GMPP directly and strengthen the customer's loyalty to specific dealers. The quarterly bonus program, discussed above, reflected GM's interest in boosting dealer sales of the GMPP. Given the nature and purpose of the program, it does not appear that GM would want to monopolize sales of the GMPP to begin with. Moreover, GM paid the same bonus to a dealer who sold the car whether the dealer sold the GMPP or GM itself did. Thus GM had nothing to gain by attempting to corner the market. For the above reasons, plaintiff's conspiracy to monopolize claim is unsupported by the record.

Since Regency has failed to substantiate its Sherman Act § 2 claims under any of the three possible theories, General Motors is entitled to summary judgment on the § 2 claims asserted by Regency in counts 10 through 13 of the Amended Complaint. Because, as concluded above, GM is also entitled to summary judgment on the Sherman Act § 1 claims, the Court will grant GM summary judgment on all federal claims asserted in counts 10 through 13.[9]

## II.  State Antitrust Claims

■ Counts 10 through 13 of the Amended Complaint also allege violations of the New Jersey Antitrust Act, N.J.S.A. § 56:9–1 *et seq.* The substantive provisions of that Act, 15 N.J.S.A. §§ 56:9–3 and 56:9–4, mirror, respectively, §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. The New Jersey Act specifically provides that it is to be construed consistently with the federal antitrust laws. 15 N.J.S.A. § 56:9–18; *see, e.g., Inter–City Tire & Auto Center, Inc. v. Uniroyal, Inc.,* 701

F.Supp. 1120, 1124–25 (D.N.J.1988) (Politan, J.); *Exxon Corp. v. Wagner,* 154 N.J. Super. 538, 544, 382 A.2d 45, 47 (App.Div. 1977). The parties have implicitly acknowledged this by failing to even mention the New Jersey Antitrust Act in their extensive briefs. Because GM is entitled to summary judgment on Regency's federal antitrust claims, it is entitled to a like judgment on Regency's state antitrust claims.

## III.  Claims Under Federal Franchise Statute

■ Regency also asserts claims under the Automobile Dealers' Day in Court Act (Dealers' Act), 15 U.S.C. §§ 1221–1225. That Act provides:

An automobile dealer may bring suit against any automobile manufacturer engaged in [interstate or foreign] commerce ... and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

15 U.S.C. § 1222. Regency alleges that GM violated § 1222 by restricting Regency's marketing of the GMPP and imposing allegedly unreasonable standards of performance on Regency (Amended Complaint counts 1 & 4), charging back Regency's account for customer cancellations and refunds (counts 2, 5, 6 & 7), threatening to terminate Regency (count 3), wrongfully denying Regency sales promotion bonuses (count 8) and breaching the implied covenant of good faith and fair dealing by unilaterally altering the terms of its Administration Guide (count 9). Besides defending its actions on the merits, GM contends that Regency has no claim under the Dealers' Act because throughout most of

---

**9.** In those counts Regency also alleges violations of 15 U.S.C. §§ 13 & 13a. The parties have not directly addressed the viability of those claims.

Since they are likewise unsupported by the record, however, GM is similarly entitled to summary judgment on those claims.

the relevant time Regency was not selling the GMPP pursuant to a franchise. The Court will first address this threshold issue.

The Dealers' Act defines "franchise" as a "written agreement or contract between any automobile manufacturer engaged in [interstate or foreign] commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." 15 U.S.C. § 1221(b). It is undisputed that GM and Regency entered into a "Dealer Sales and Service Agreement" effective January 9, 1981. *See* First West Affidavit Exhibit A. It is also undisputed that the parties did not enter into a GMPP "Participation Agreement" until October 16, 1985, the same day they executed the "Supplemental Agreement." *See id.* Exhibit I. GM argues that there was thus no "written agreement" between the parties for the sale of the GMPP until October 1985, long after most of the GM actions of which Regency complains. GM points out that the Dealer Sales and Service Agreement related only to "the sale and service of Oldsmobile motor vehicles and related parts and accessories." Sales of the GMPP, GM contends, do not fit within that description and hence could not have been pursuant to this Agreement but were authorized solely by an oral understanding between the parties. Other dealerships selling the GMPP did so pursuant to a Participation Agreement, GM notes. GM further alleges that Regency ran its nationwide GMPP sales program as a separate business on a site across town from its dealership, using a separate pool of employees and targeting a separate group of customers. Gartenberg Deposition, Waters Affidavit Exhibit S, at 70–73; Thomas Affidavit ¶ 3. Thus, according to GM, although there was a franchise arrangement between the parties within the meaning of 15 U.S.C. § 1221(b), that arrangement did not provide for Regency's sale of the GMPP, so that the dispute over Regency's sale of the GMPP is not actionable under 15 U.S.C. § 1222.

Regency counters that in the period from January 1981 to October 1985 it was indeed selling the GMPP pursuant to the Dealer Sales and Service Agreement. In support of this contention, Regency notes the large number of Plans that it sold during that period—some 17,111—and asks the Court to infer that it is unlikely that GM would have allowed Regency to conduct such a volume of business solely pursuant to an elusive oral understanding. In addition, Regency makes various allegations showing that GM treated the GMPP as a franchise product and that Regency's sales of the Plan were pursuant to the Sales and Service Agreement. First, GM each year since 1983 forwarded to Regency and other GM dealers copies of the GMPP Administrative Guide in the ordinary course of its relationship with the dealers. First West Affidavit ¶ 2. Second, GM, in the ordinary course of its franchise relationship with its dealers, generates a monthly financial statement for each GM dealer on a GM form with data supplied by the dealer. The financial statement has an account to record not only actual sales of the GMPP but projected sales as well. Regency received the monthly financial statement from GM in the ordinary course of its business in the approximately five-year period following the execution of the Sales and Service Agreement and preceding the execution of the Participation Agreement. Second West Affidavit ¶¶ 29–31; *id.* Exhibits M & N. Third, Regency's nationwide sales of the GMPP, including those antedating the execution of the Participation Agreement, were monitored and encouraged by the same GM representatives who monitored the sale of other GM-franchised products. All GM local- and district-level representatives treated the GMPP as a franchised product. *Id.* ¶ 31. Fourth, Regency sold the GMPP initially from a location expressly approved by an addendum to the Sales and Service Agreement and subsequently from two locations that, though not approved by that Agreement, were later approved by the Participation Agreement. *Id.* ¶ 32; *compare id.* Exhibit P *with* First West Affidavit Exhibit A. Finally, disputing GM's contention that the nationwide GMPP was a separate business,

Regency contends that it operated the program as a department of Regency and that all personnel who worked within the program were employees of Regency and were paid directly by Regency. Second West Affidavit ¶ 33.

Regency has raised sufficient factual issues to place into genuine dispute the question whether it sold the GMPP before October 1985 pursuant to a franchise within the meaning of the Dealers' Act. A jury could reasonably find on this record that the Sales and Service Agreement, implicitly or by subsequent oral modification, authorized Regency's nationwide GMPP sales program; although other dealers sold only pursuant to a Participation Agreement, it is possible that Regency was an exception. Thus the Court cannot resolve this threshold issue as a matter of law.

■ As to GM's actions *following* the execution of the Participation Agreement, there is little question that they are actionable under the Dealers' Act. The Participation Agreement clearly constitutes a franchise agreement within the meaning of 15 U.S.C. § 1221(b); GM has not seriously disputed this.

Having determined that Regency's claims are partially and perhaps completely within the Dealers' Act, the Court now turns to the merits of those claims. As already noted, Regency alleges that GM breached its duty under the Dealers' Act to perform its contractual obligations in good faith. GM claims that it acted solely to protect its trademarks and good will and in no way acted in bad faith towards Regency. GM also asserts the affirmative defense that it was Regency that failed to act in good faith. While the evidence largely supports GM's version of the facts, the Third Circuit has cautioned against determining the parties' motivations on a summary judgment motion in a Dealers' Act case. *See Rea v. Ford Motor Co.,* 497 F.2d 577, 583 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). "[W]hether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question the determination of which will depend on the circumstances arising in each particular case." *Id.* On the one hand, GM was rightly concerned with ending Regency's abusive practices, such as using the words "URGENT" and "General Motors Protection Plan Headquarters" in its mail solicitation materials, and thus was acting within its rights in persistently demanding that Regency discontinue these practices. This conclusion is not changed by the fact that GM initially authorized these practices, because it is apparent that GM simply failed to foresee the voluminous customer complaints that these practices would generate. On the other hand, it is not at all clear from the record whether GM was acting properly in altering the conditions under which consumers could obtain refunds for the purchase of the GMPP, adjusting its chargeback procedures and charging back Regency's account under these new procedures. Since there are genuine issues of material fact as to whether GM is liable to Regency under the Dealers' Act, the Court will deny GM's motion for summary judgment on counts 1 through 9 of the Amended Complaint to the extent that those counts seek relief under the Dealers' Act.

## IV. Claims Under the New Jersey Franchise Practices Act

■ In addition to seeking relief under the federal Dealers' Act, counts 1 through 9 of the Amended Complaint seek relief under the New Jersey Franchise Practices Act (Franchise Act), N.J.S.A. § 56:10–1 *et seq.* That statute prohibits a franchisor from terminating, canceling or failing to renew a franchise without good cause, which is defined as "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." N.J.S.A. § 56:10–5; *see also id.* § 56:10–9.

As with the federal Dealers' Act, the threshold issue under the New Jersey statute is whether the relationship between GM and Regency was a franchise as defined by the statute. The Franchise Act defines franchise as

a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. § 56:10–3(a). Like the Dealers' Act, the New Jersey statute requires a written agreement or arrangement. The New Jersey definition is, however, broader than the federal definition in one sense and narrower in another. It is broader in that it encompasses all types of businesses, not just automobile retailing. It is narrower than the Dealers' Act definition in that it contains the additional requirements of a license to use a trade name or similar characteristics and of a community of interest. *See, e.g., New Jersey American, Inc. v. Allied Corp.*, 875 F.2d 58, 60 (3d Cir.1989). Besides arguing, as it did with the Dealers' Act, that there was no written agreement until after most of the actions complained of, GM contends that its relationship with Regency for the sale of the GMPP did not contain the two additional elements of the New Jersey definition of a franchise.

The Court has already held, however, that Regency has raised sufficient factual questions as to whether the January 1981 Sales and Service Agreement authorized Regency's nationwide sales of the GMPP. *See supra* Part III. GM does not dispute that the Sales and Service Agreement is itself a franchise as defined in N.J.S.A. § 56:10–3(a). Thus it is a factual question whether the GM–Regency relationship regarding the GMPP prior to the execution of the Participation Agreement comes within the Franchise Act. As to the period after the date of that agreement, the Court need not decide whether that agreement is itself a franchise within the meaning of N.J.S.A. § 56:10–3(a), because there are also factual questions as to whether the Participation Agreement is "ancillary or collateral" to the Sales and Service Agreement. The Franchise Act specifically reaches collateral or ancillary agreements: it is a violation of the Act "[t]o provide any term or condition in any lease or other agreement ancillary or collateral to a franchise, which term or condition directly or indirectly violates this act." N.J.S.A. § 56:10–7(f). Although the express language of the above-quoted section seems to reach only the *inclusion* of a violative term in an ancillary or collateral agreement, the statute might be construed to prohibit the *breach* of such an agreement if such a breach was the franchisor's way of terminating, canceling or failing to renew the franchise. *See Shell Oil Co. v. Marinello*, 63 N.J. 402, 407, 307 A.2d 598, 601 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974) (focusing on whether a franchise contract and a secondary contract are "part of an integrated business relationship").

Just as the Court is unable to resolve the threshold issue under the Franchise Act, it is also unable to resolve as a matter of law the question whether GM's actions violated the Franchise Act assuming the parties' relationship is covered by that Act. As Regency notes, the Franchise Act prohibits not only the direct cancellation of a franchise without good cause but also indirect action to achieve the same end. *See Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637, 653 (D.N.J.1980) (Ackerman, J.) (citing *Shell Oil, supra*). Judge Ackerman in *Gelardi* cited § 7(e) of the Franchise Act, N.J.S.A. § 56:10–7(e), which prohibits a franchiser from imposing "unreasonable standards of performance upon a franchisee," and held that constructive cancellation of a franchise violates the Franchise Act:

When every inference is drawn in Gelardi's favor it appears that Miller's conduct towards Gelardi made Gelardi's business life sufficiently miserable that Gelardi was forced to quit its distribution of Miller products in its primary area of responsibility. While any given action of Miller may not have violated this statutory prohibition the cumulative effect amounted to imposing an unreasonable standard of performance insofar as Miller expected Gelardi to perform at all under the adverse conditions that Miller had created.... If Miller created conditions that left Gelardi with little choice other than ending its performance of its end of the distributorship agreement

then it had created 'unreasonable standards of performance.' For purposes of the present case at least, N.J.S.A. 56:10–7(e) can be read as a codification of a franchisor's responsibility to comply with the covenant of good faith and fair dealing.

Regency alleges that GM imposed unreasonable standards of performance and constructively cancelled Regency's franchise by charging back its account for customer cancellations and refunds, wrongfully denied Regency sales promotion bonuses and unilaterally altered the terms of the GMPP Administration Guide in violation of the implied covenant of good faith and fair dealing. As with the merits of the Dealers' Act claims, the Court is unable on the current record to resolve the propriety of chargebacks and related complicated issues raised by Regency. Therefore, GM's request for summary judgment on the Franchise Act claims raised in counts 1 through 9 will be denied as well.

V. Miscellaneous Common Law Claims

In counts 14 through 17 and 19 through 22 of its Amended Complaint, Regency asserts a host of common law claims against General Motors, namely interference with prospective economic advantage and interference with existing business relationships (counts 14 & 16), unjust enrichment (count 15), conversion (count 17), common law fraud (count 19), breach of the duty of care (count 20), and promissory estoppel (counts 21 & 22). In count 18 Regency also asserts a claim under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1 *et seq.* The parties have briefed the many issues raised by these claims only in passing. For the same reasons that it denied GM's summary judgment motion as to Regency's claims under the Dealers' Act and the Franchise Act, the Court will also deny GM's motion with respect to these miscellaneous claims, with one minor exception: in light of the lack of evidence to support Regency's antitrust claims, the Court will grant GM summary judgment in part on count 14 to the extent that that count alleges that GM combined with others to tortiously interfere with Regency's prospective economic advantage. Moreover, the Court has serious doubts as to some of the other claims,

particularly counts 18 and 19. Though the Court does not wish to invite any further summary judgment motions, some of the shrapnel from Regency's shotgun approach to pleading can be cleared prior to trial through motions in limine.

CONCLUSION

Regency has failed to meet its burden in establishing the viability of its federal and state antitrust claims. Accordingly, the Court will grant GM summary judgment on counts 10 through 13 of the Amended Complaint. Regency has, however, raised genuine issues of material fact as to whether GM breached its duty of good faith under the federal Automobile Dealers' Day in Court Act, constructively cancelled Regency's franchise or otherwise violated the New Jersey Franchise Practices Act, or is liable to Regency under various common law theories and one miscellaneous state statutory theory. Accordingly, the Court will deny GM's motion for summary judgment as to counts 1 through 9 and 14 through 22 of the Amended Complaint, with the exception that the Court will grant GM summary judgment in part on count 14 to the extent that count alleges that GM combined with others to tortiously interfere with Regency's prospective economic advantage.